UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
at COVINGTON

CIVIL ACTION NO. 03-CV-160-DLB

JAN RUBIN ASSOCIATES, INC.                                    PLAINTIFF

vs.              MEMORANDUM OPINION & ORDER

HOUSING AUTHORITY
OF NEWPORT, ET AL.                                           DEFENDANTS

********************************

## I.    INTRODUCTION

Plaintiff, Jan Rubin Associates, Inc. ("JRA"), brings this § 1983 action against Defendants, Housing Authority of Newport ("HAN") and Mark H. Brown ("Brown"), in his individual and official capacity, alleging violations of due process and equal protection.[1] Plaintiff also asserts state law claims for breach of contract and promissory estoppel.  This matter is presently before the Court upon Motions for Summary Judgment by Defendants HAN (Doc. # 83) and Brown (Doc. # 84), to which Plaintiff submitted a Response (Doc. # 91) and Defendants filed their respective Replies (Docs. # 103, 104).  Therefore, the motions are ripe for the Court's review.

## II.    FACTUAL BACKGROUND

Plaintiff is a relatively small, woman-owned development company that has cultivated a long-standing relationship with Defendant HAN in connection with the

_____

[1] Plaintiff also implicated a separate Defendant, Michael Syme, in Counts III and IV of its Complaint.  However, pursuant to the Court's Memorandum Opinion and Order issued on April 14, 2004 (Doc. # 24), the claims against Defendant Syme were dismissed.

Dockets.Justia.com

development of properties in the HOPE VI program ("HOPE").  HOPE is a federal program administered by the Department of Housing and Urban Development ("HUD"), which seeks to redevelop existing public housing properties into more modern, less-densely populated mixed-income developments.

In 1998, HAN chose JRA through a competitive selection process to provide professional consulting assistance in developing a master plan for the potential development of properties in the HOPE program.[2]  Pursuant to a "Consulting Agreement" executed in April of 1998, JRA was hired to prepare the HOPE grant application for HAN. In 2000, after failing the first time, HAN received a HOPE grant from HUD in the amount of approximately $28 million.  Subsequently, in 2001, following months of contentious negotiations wherein JRA threatened to leave the project on numerous occasions, JRA and HAN eventually reached an "Amended Consulting Agreement" to replace the initial consulting agreement that Plaintiff acknowledged was no longer binding.  The new agreement included additional terms made necessary by the awarding of the HOPE grant in order to move forward with project, although the contract remained styled as a consulting agreement rather than a development contract.

---

[2] According to Plaintiff, JRA was hired by HAN for more than mere consulting, although that was the primary role of JRA prior to the grant award.  Plaintiff alleges that the mutual understanding of the parties was that JRA was hired as a long-term development partner even though the initial contracts, which pertained solely to consulting services, did not explicitly memorialize such an understanding.  As evidence of this greater role, which lies at the heart of Plaintiff's case, JRA points to HAN's choice to initially solicit consulting services through a "Request for Qualifications" (RFQ), rather than a "Request for Proposals" (RFP).  The significance of this decision, according to Plaintiff, is that HUD regulations permit RFQs to be issued where a housing authority seeks a "development partner" but an RFP can be utilized where the housing authority merely seeks "outside assistance."  Nevertheless, both parties set forth a significant amount of evidence in an attempt to demonstrate the true status of JRA during the early phases of the project – i.e., whether both parties intended JRA to be the developer.

However, when HAN submitted the new consulting contract to HUD for approval, as required, HUD informed HAN that because the grant had already been obtained, HAN would need to execute a "Developer Services Agreement" to move forward because a mere consulting agreement would no longer prove sufficient.  Although the record suggests that HUD assumed that HAN would simply enter a new agreement with JRA to formally make Plaintiff the developer, HAN chose instead to issue a new RFP for developer services.  The decision by HAN to issue an RFP was, from Plaintiff's point of view, entirely unexpected because of JRA's assumption, based on an alleged mutual understanding and past representations, that it would serve as the developer for the HOPE project once the grant was obtained from HUD.  According to Plaintiff, HAN allegedly misinformed JRA that the issuance of an entirely new RFP to select a developer, rather than simply reconstructing JRA's contractual relationship with HAN, was required by HUD.

Upon knowledge of the new RFP, HUD communicated to HAN that an interim contract for JRA's services would be necessary to define the ongoing relationship of the parties pending the RFP and ultimate execution of a developer services contract upon selection of a development company.  In an April 17, 2002 board meeting, HAN noted that it desired JRA to continue providing services "until a developer can be procured."  Shortly thereafter, in May of 2002, JRA and HAN executed an "Interim Services Agreement" to allow JRA to continue its consulting work on the HOPE project while HAN selected a developer through the RFP process.

HAN's search for a developer commenced with the issuance of the RFP on May 21, 2002.  JRA planned to submit a bid proposal, despite its disagreement with HAN's decision to issue the RFP.  However, JRA realized that certain requisite qualifications listed in the

RFP would restrict it from bidding.  JRA subsequently contacted Tom Guidugli, the Mayor of Newport, who had been indirectly involved in the process from the beginning, and informed the Mayor of the problem.  Following a discussion with the Mayor, HAN revised the qualification requirements and issued a new RFP to reflect the changes, which would permit JRA to place a bid on the project.  Prior to submitting its bid, however, JRA forwarded multiple interrogatories to HAN requesting specific details of the project, including suggested fee structures.  After receiving HAN's responses, JRA submitted a bid for the HOPE project with a proposed developer fee of 9%.

On July 10, 2002, following a competitive selection process, HAN awarded the project to JRA and informed Plaintiff that they were the chosen developer.  Subsequently, JRA and HAN began negotiating a "Developer Services Agreement."  The parties participated in two telephone conferences during the first two weeks of August, the first of which resulted in agreement on the majority of terms for the new contract.  However, following the second conference call on August 12, 2002, the parties reached an impasse on several remaining terms, many of which were considered "deal breakers" by both sides. After HAN communicated a summary of negotiations to JRA, including its non-negotiable stance on many of the important terms, and requested a timely response from JRA in order to find a new developer if negotiations broke down, JRA informed HAN that it would be leaving the project because of the parties' inability to reach agreement for JRA's developing services.

According to Plaintiff, HAN's positions on the outstanding terms of the contract were unreasonable and reached in bad faith, a sentiment that was implicitly communicated to HAN upon JRA's decision to cease negotiations:

Most of the issues that remained open after yesterday's conference call you have addressed, and HAN has rejected JRA's positions. Since there are so many open issues as to which JRA cannot reasonably be expected to accept HAN's stated position, it seems apparent that JRA and HAN will not be able to reach mutual agreement. I note that you did not address the issue of the scope, if any, of JRA's financial guarantees, which is, of course, paramount.

Under these circumstances, I do not think that an item by item response is needed. JRA wishes HAN much success in its HOPE VI project, which apparently will have to go forward without JRA's involvement. JRA will, of course, be glad to cooperate in the transition.

(J.A. Vol. 1, Exh. 79, p. 1). Plaintiff now believes that HAN's allegedly unreasonable negotiating position was a deliberate attempt to "jettison" JRA from the project because of internal conflict and alleged discrimination that had been ongoing against JRA as a woman-owned enterprise. Mayor Guidugli, who felt it was important to retain JRA because of its unmatched knowledge and experience with the project, attempted to convince the parties to continue negotiations, but his efforts were unsuccessful.

In the weeks that followed, HAN searched for a new developer, interviewing the next two candidates that were chosen in line behind JRA during the initial RFP selection process. HAN ultimately selected Pennrose Properties as developer for the HOPE project. According to Plaintiff, HAN's contract with Pennrose contained significantly better terms than those proposed to JRA, although Defendant maintains that the contracts were almost identical and where the terms differ, such discrepancies were the result of independent negotiations where Pennrose received some more advantageous and some less advantageous terms relative to JRA.

### III.    ANALYSIS

As a starting point, it is important to note for organization's sake that Defendants' alleged conduct, that which gave rise to Plaintiff's claims, is largely separable at a single

juncture: the issuance of the RFP in May of 2002. The RFP is the demarcation point because it was at that moment that any prior contractual right of JRA was effectively breached by HAN's issuance of the RFP. Once the RFP was issued, JRA was on notice that the development contract was, according to HAN, open to other developers. Because JRA allegedly believed it was the chosen long-term developer, its injury would have materialized with the issuance of the RFP and any claims arising thereafter would be independent from the pre-RFP conduct.

In that regard, Plaintiff also alleges claims based on conduct post-RFP, namely that JRA was awarded the contract and its contractual right was breached through bad faith negotiations, which were an alleged pretext to remove JRA from the project entirely. Therefore, as the analysis moves forward, the relevant conduct and the claims based thereon will primarily be characterized in terms of pre-RFP or post-RFP.

## A.    Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A dispute over a material fact cannot be "genuine" unless a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party." *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 361 (6th Cir. 2001).

Once the movant has met its initial burden of establishing that summary judgment may be appropriate as a matter of law, the non-movant cannot rest on its pleadings but must instead demonstrate that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts, it must present significant probative evidence in support of its complaint to defeat the motion for summary judgment." *Expert Masonry, Inc. v. Boone County*, 440 F.3d 336, 341 (6th Cir. 2006). If a reasonable jury could not return a verdict for the nonmoving party based on the evidence construed in its favor, summary judgment should be granted to movant. *See Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).

**B.    Federal § 1983 Claims**

Plaintiff alleges claims under 42 U.S.C. § 1983 for violations of due process and equal protection stemming from JRA's loss of the development contract with HAN for the HOPE project. Courts are authorized under § 1983 to "redress violations of 'rights, privileges, or immunities secured by the Constitution and [federal] laws' that occur under color of state law." *Huron Valley Hosp., Inc. v. City of Pontiac*, 887 F.2d 710, 714 (6th Cir. 1989) (quoting 42 U.S.C. § 1983). This provision "creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere." *Flint v. Kentucky Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001). To that effect, "to establish a prima facie case under 42 U.S.C. § 1983, a plaintiff must prove the following two elements: (1) the defendant must be acting under the color of state law, and (2) the offending conduct must deprive the plaintiff of rights secured by federal law." *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)).

-7-

1.      **Statute of Limitations**

Defendants contend that both of Plaintiff's federal claims, and their subclaims, are time-barred.  Because 42 U.S.C. § 1983 does not contain its own statute of limitations ("SOL"), the limitation period is borrowed from the applicable state law in a given case. Here, it is undisputed that Plaintiff's federal § 1983 claims are governed by Kentucky's one-year SOL.  *See* K.R.S. § 413.140(1); *see also Collard v. Kentucky Bd. of Nursing*, 896 F.2d 179, 182 (6th Cir. 1990) ("we conclude that section 1983 actions in Kentucky are limited by the one-year statute of limitations found in section 413.140(1)(a)").  However, although state law prescribes the limitation period, the question of when the SOL begins to run is determined by federal common law.  *See Wilson v. Garcia*, 471 U.S. 261, 268-71 (1985); *Ruff v. Runyon*, 258 F.3d 498, 500 (6th Cir. 2001).

The SOL begins to run on the date when a plaintiff knew, or should have known, of the injury that forms the basis of the action.  *See Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005).  "This inquiry focuses on the harm incurred, rather than the plaintiff's knowledge of the underlying facts which gave rise to the harm."  *Ruff*, 258 F.3d at 501 (quoting *Friedman v. Estate of Presser*, 929 F.2d 1151, 1159 (6th Cir. 1991)).  "A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence."  *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984).

The relevant timeline for purposes of an SOL analysis in the case *sub judice* is as follows: (1) in 1998, HAN first competitively selected JRA as the lead consultant for the HOPE project; (2) following the grant award in 2000, the parties reached an amended consulting agreement in 2001; (3) after HUD notified HAN that it would need to contract for development rather than consulting services, *HAN issued a new RFP on May 21, 2002 in*

*search of a developer*; (4) JRA was awarded the project on July 10, 2002; (5) following a second telephone conference on August 12, 2002, negotiations reached an impasse; (6) JRA informed HAN on August 13, 2002 that it was leaving the project; (7) on July 11, 2003, the parties allegedly reached a tolling agreement for settlement discussions that extended through July 24, 2003; and (8) Plaintiff filed the instant action on July 24, 2003.

Therefore, given the applicable one-year statute of limitations, the effective limitations period, which is the time frame when the date of accrual must have fallen if Plaintiff's claims are to proceed, is July 24, 2002 through July 24, 2003 (possibly July 11 with tolling agreement). As discussed below, because the post-RFP causes of action accrued sometime between August 9-13, 2002, the claims are not time-barred. However, any claims based solely on pre-RFP conduct are time-barred.

### a. Post-RFP Claims Timely

The difficulty in addressing Plaintiff's claims, both in the SOL context and on the merits, stems not only from Plaintiff's sometime obscure and inconsistent pleading, but also the separate phases of the relevant conduct bifurcated by the 2002 RFP. Defendants essentially argue that the entirety of Plaintiff's federal claims are time-barred because the issuance of the RFP in 2002 triggered the accrual of Plaintiff's causes. On the other hand, Plaintiff contends that its claims are timely, primarily because the SOL was tolled by Defendant's alleged fraudulent concealment as well as a tolling agreement. As to Plaintiff's equal protection and due process claims based on post-RFP conduct, the Court agrees with Plaintiff, though on different grounds.

Despite Plaintiff's wayward and ultimately dispensable analysis,[3] Defendants' argument that the date of accrual for all of the § 1983 claims was the issuance of the new RFP on May 21, 2002 is untenable. As couched in the Complaint, the triggering event for Plaintiff's equal protection and due process claims, insofar as they are based on post-RFP conduct, was the alleged bad faith negotiating by HAN, which Plaintiff asserts was merely a pretext to purge JRA from the HOPE project. To that effect, in viewing the facts in a light most favorable to Plaintiff, the record demonstrates that the appropriate date of accrual for Plaintiff's federal claims was sometime in the first two weeks of August 2002 when the parties held negotiations for the Developer Services Agreement that were unsuccessful.

In the context of the post-RFP due process claim, Plaintiff could not have known of its injury until the contract was "lost" through what, in Plaintiff's view, was effectively a form of constructive termination from the project. Plaintiff alleges that the awarding of the project pursuant to the RFP created a property interest and, therefore, the claim was not cognizable until the alleged deprivation took place. Simply put, the lack of a definite date notwithstanding, Plaintiff's cause of action accrued when contract negotiations for the Developer Services Agreement failed in August of 2002, at which time Plaintiff first "knew" of its alleged injury. Accordingly, because the approximate date of accrual fell within the applicable limitations period that began to run in July of 2002, Plaintiff's due process claim based on post-RFP conduct is timely as a matter of law.

---

[3] Rather than relying on the timeline in their Complaint, which places the accruing event (i.e., the breakdown in negotiations from HAN's alleged bad faith tactics) within the limitations period, Plaintiff instead relies solely on theories of equitable and contractual tolling, based on fraudulent concealment and an agreement allegedly reached during settlement talks, respectively.

As to Plaintiff's post-RFP equal protection claim, which asserts a theory of constructive discharge, the accrual timeframe would also be in August of 2002, which would render the claim timely.[4]  Plaintiff's claim asserts that JRA was selected by HAN to be the developer on the HOPE project pursuant to the RFP.  As such, the alleged adverse action did not occur until negotiations ended and JRA was no longer the chosen developer for the project.  Consequently, similar to the post-RFP due process claim, the post-RFP equal protection claim (constructive discharge) is timely as a matter of law.

### b.    Pre-RFP Claims Time-Barred

Both of Plaintiff's federal claims also contain subclaims based on pre-RFP conduct, although the subclaims were not directly asserted in the Complaint.  First,  Plaintiff asserts that JRA had a property interest in the development contract from the beginning of the relationship between HAN and JRA in 1998 when JRA was selected as a developing consultant and was allegedly promised the long-term development rights.  Plaintiff contends that it was deprived of this alleged property right without due process upon the issuance of the new RFP in 2002.  This claim, which is effectively a due process claim based on a theory of promissory estoppel, is time-barred.

Defendants argue that any right to the long-term development contract that JRA believed it possessed based on the conduct of Defendant pre-RFP was immediately

---

[4] In reality, the date of accrual would likely be much later because, in order to cognize a claim for an equal protection violation, it would be necessary to establish that others similarly situated, but outside of the protected class (i.e., the new developer, Pennrose), were treated differently than Plaintiff.  Therefore, assuming Plaintiff was diligent in obtaining the contract of the new developer, which the record demonstrates and Defendants appear to concede, then the filing of the equal protection claim would fall well within the limitations period.  Either way, the claim is timely.

breached upon the issuance of the RFP and, therefore, the claim is outside of the limitations period. The Court agrees. Insofar as Plaintiff is alleging that HAN promised the development contract to JRA, or that the parties had a mutual understanding, once the RFP was issued, JRA was on explicit notice that HAN was searching for a new developer. Although HAN had the ability to select JRA, which they in fact did, JRA had no way of knowing it would be awarded the project. Consequently, the issuance of the RFP in May of 2002 is the date of accrual for Plaintiff's cause of action because it was at that moment that Plaintiff should have known that their alleged rights were violated.

In response, Plaintiff contends that the SOL was tolled because of fraudulent concealment by HAN.[5] *See* Ky. Rev. Stat. § 413.190(2) (2006). Specifically, Plaintiff's argument is that because HAN allegedly lied to JRA about the RFP, claiming that HUD required HAN to issue it, Plaintiff could not have known of its injury. Plaintiff's position fails as a matter of law because the alleged concealment was not relevant to the claim.

To invoke equitable tolling based on fraudulent concealment, Plaintiff must plead with particularity that: (1) Defendants wrongfully concealed their actions; (2) Plaintiff failed to discover the operative facts that form the basis for its cause of action within the limitations period; and (3) Plaintiff exercised due diligence to discover the facts. *See Evans v. Pearson Enters.*, 434 F.3d 839, 851-52 (6th Cir. 2006) (citing *Dayco Corp. v. Goodyear*

---

[5] Plaintiff also argues that the parties reached a tolling agreement prior to the institution of Plaintiff's action that tolled the SOL and brought Plaintiff's claims within the limitations period. This argument is untenable. Even assuming the tolling agreement is valid, which is questionable because both parties never signed an actual agreement, the agreement would not save Plaintiff's claim. The correspondence in question was sent by Plaintiff's counsel to Defendant's counsel on July 11, 2003, and purported to memorialize an agreement to toll the SOL through July 24, 2003. However, because the pre-RFP due process claim accrued at the issuance of the RFP in May of 2002, the claim still fell outside the limitations, regardless of whether the commencement of the limitations period is the original July 24, 2002 date or the tolled date of July 11, 2002.

*Tire & Rubber Co.*, 523 F.3d 389, 394 (6th Cir. 1975).  However, while the three prongs are satisfied in the abstract, Plaintiff's argument nevertheless fails because when placed into context, there is no legal significance to the alleged misrepresentation by HAN under the circumstances.  In other words, the concealment was not material, or even relevant, to Plaintiff's pre-RFP claim.

When examined from the perspective of the second required element,  the alleged misrepresentation by HAN would not have affected Plaintiff's ability to cognize the due process claim upon issuance of the RFP.  Assuming Plaintiff actually possessed a constitutionally protected property interest in the development contract pre-RFP, then the issuance of the RFP was the moment of deprivation, *regardless of whether HUD required it or HAN unilaterally issued it*, because the contract was placed back on the market.  Accordingly, Plaintiff's subclaim for a due process violation based on conduct pre-RFP accrued in May of 2002 with the issuance of the RFP and is therefore time-barred.

Second, Plaintiff also asserts a pre-RFP equal protection claim based on a hostile work environment theory.  This claim is similarly time-barred because the relevant conduct as alleged by Plaintiff occurred pre-RFP.[6]  Plaintiff's arguments pertaining to equitable and contractual tolling are inapposite to the accrual of this claim because the issuance of the RFP is not implicated and the alleged tolling agreement was entered subsequent to any alleged discriminatory conduct that is the basis of Plaintiff's action.  Additionally, although the record does not demonstrate any proof of a hostile work environment post-RFP, even

---

[6] Defendants also argue that Plaintiff did not provide notice as to the assertion of a hostile workplace theory by way of its Complaint or during discovery.  The Court need not reach this argument.

assuming arguendo that the discrimination was ongoing beyond the RFP, Plaintiff should have known of its injury prior to the issuance of the RFP because the entirety of the conduct specifically alleged by Plaintiff took place prior to the RFP.[7]  Accordingly, the equal protection subclaim for a hostile work environment having accrued months, if not years, before the limitations period, the claim is therefore time-barred as a matter of law.

To summarize the Court's SOL rulings: (1) the due process claim based on pre-RFP conduct is time-barred; (2) the due process claim based on post-RFP conduct is timely; (3) the equal protection claim based on pre-RFP conduct (hostile work environment) is time-barred; and (4) the equal protection claim based on post-RFP conduct (constructive discharge) is timely.

### 2.  Procedural Due Process Claim

To maintain an action under 42 U.S.C. § 1983 based on a violation of procedural due process, Plaintiff must show that: (1) their property interest at stake is a protected property right under the Fourteenth Amendment, (2) the deprivation of the interest contravened notions of due process, and (3) state or administrative processes and remedies to redress the alleged violation are inadequate.  *See Jefferson v. Jefferson County Pub. Sch. Sys.*, 360 F.3d 583, 587-88 (6th Cir. 2004); *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002).  Although the analysis lends itself to a three-pronged approach, the threshold issue is always whether the asserted property interest is a constitutionally

---

[7] Furthermore, even if Plaintiff can adduce proof of ongoing discrimination post-RFP, the parties were not in a legal relationship during that period, which would itself render a hostile work environment claim unpersuasive.  However, any evidence of discrimination post-RFP could possibly go toward Plaintiff's equal protection claim for constructive discharge.

protected right.  *See R.S.W.W., Inc.*, 397 F.3d at 434-35.  If no property right exists, the claim must fail on its face.

The seminal case defining the boundaries of constitutionally protected property rights under the Fourteenth Amendment is the Supreme Court's decision in *Board of Regents v. Roth*, declaring:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.... Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

408 U.S. 564, 577 (1972).  In other words, protected property interests are created by the operation of state law, while federal law in turn determines whether the interest created, if any, rises to the level of a constitutional protected property interest.  *See id.*

Plaintiff's assertion is that a contractual property right was conferred upon it by state law when Defendant HAN awarded the development contract to JRA for the HOPE project, and that the contract therefore constituted a constitutionally protected property interest because JRA had legal claim of entitlement to the contract.  In Plaintiff's words, when "JRA was selected pursuant to the RFP in 2002, it won more than some abstract interest in future negotiations."  Plaintiff acknowledges that "the parties had to negotiate the terms of the Developer Services Agreements," but maintains that because HAN selected JRA for the project pursuant to the RFP, "JRA thereby acquired a clear property interest in the contract to serve as developer of the HOPE project."

Notwithstanding Defendant's citations to various authorities outside of the Sixth Circuit, Plaintiff's only authority in support of its proposition that the awarding of a government contract constitutes a property interest for due process purposes, although demonstrating the possibility that a property interest may exist, directly supports the opposite conclusion here.  In *United of Omaha Life Ins. Co. v. Solomon*, an insurance vendor asserted claims for due process violations stemming from the state of Michigan's decision to rebid an insurance contract that had resided with the plaintiff's company for thirty years.  *See* 960 F.2d 31 (6th Cir. 1992).  The *Solomon* court, in addressing plaintiff's due process claim for a deprivation of a property interest, explained that there are two scenarios where a property right may exist in this context:

> A "disappointed bidder" to a government contract may establish a legitimate claim of entitlement protected by due process by showing either that it was actually awarded the contract at any procedural stage or that local rules limited the discretion of state officials as to whom the contract should be awarded.

*Id.* at 34 (citing *Peterson Enter., Inc. v. Ohio Dep't of Mental Retardation and Developmental Disabilities*, 890 F.2d 416 (6th Cir. 1989) (unpublished opinion)); *see also Enertech Elec. v. Mahoning County Comm'rs*, 85 F.3d 257, 260 (6th Cir. 1996).

Plaintiff maintains that because JRA was "actually awarded" the contract by HAN after the RFP, which Defendant does not dispute, it therefore possessed a legitimate claim of entitlement to the contract under *Solomon*.  However, the court in *Solomon* went on to conclude that a property interest did not arise in that case because the defendant "retained discretionary authority to reject any and all bids and *to 'accept' a bid only by signing a contract* or a purchase order."  *Id.* at 34-35 (emphasis added).  In other words, if circumstances reveal that the awarding of a contract pursuant to an RFP extends only an

-16-

invitation to negotiate, rather than a binding agreement, then a legal claim of entitlement cannot exist as a matter of law.    In that regard, the record in the current action demonstrates that HAN retained discretionary authority to "accept" a bid pursuant to the RFP only by way of signing a formal contract and that JRA was fully aware of the non-binding nature of the RFP selection process.

First, similar to the RFP in *Solomon*, the RFP here stated that HAN reserved "the right reject any or all proposals," the significance of which is that, in contrast to other government procurement scenarios, there were no external restrictions placed on HAN's *ultimate* decision to select one bidder over another (e.g., it  was not required to take the lowest bidder or the highest ranked proposal based on established criteria).  HAN was free to request, reject, and accept proposals without establishing any type of legal relationship with the prospective developers.  Consequently, as in *Solomon*, HAN was free to "accept" only by executing a contract with the preferred developer and, to that effect, when HAN informed JRA that they were "awarded the contract," the award itself was not a contract.

Second, and more importantly, both the explicit and implicit force of the RFP as a non-binding offer to negotiate was clearly communicated to JRA before Plaintiff submitted its bid to HAN for the HOPE project.  Prior to submitting a bid, JRA forwarded over forty interrogatories to HAN, a procedural step authorized by the RFP, in an attempt to glean more project details and evaluate whether it would be in JRA's interests to compete for the project.  In responding to the questions, HAN provided JRA with numerous project details, despite JRA's already extensive knowledge of the project given its role as the primary consultant.  Notably, one area of inquiry by JRA asked for an explanation as to the contractual relationship of the parties following a bid award but pre-contract::

35.    **If the parties are unable to agree on a contract, will the developer be entitled to compensation for work completed?**

The developer will be responsible for costs incurred prior to a contract being executed. If a reasonable master development agreement cannot be entered into, the developer will not be entitled to any compensation. This is one of the risks the developers are ordinarily expected to take and it is expected that the developer selected by HAN will assume this obligation.

(J.A. Vol. I, Exh. 25, p. 7-8) (bold in original).

As is plainly evident from the answer to JRA's question, HAN directly informed JRA that any interim period between the "awarding" of the project and the actual execution of a contract would not create any legal obligations.[8] Simply put, JRA knew that being awarded the contract did not mean that a contract had been formed. JRA may have expected that a contract would be executed, and justifiably so, but such a unilateral expectation does not constitute a constitutionally protected property interest absent a legal claim of entitlement. *See Roth*, 408 U.S. at 577. Therefore, taking Plaintiff's factual assertions as true, Plaintiff's claim fails as a matter of law because the record establishes that HAN retained the discretionary authority to "accept" a bid only through executing a formal contract with the chosen developer and that JRA possessed this knowledge prior to submitting its bid. Accordingly, Defendants' motions as to Count IV are granted and Plaintiff's due process claims are dismissed as a matter of law.[9]

---

[8] Furthermore, the very fact that the parties were unable to reach agreement on such a large number of material terms in negotiating the developer services contract is strong evidence that there was no prior contractual agreement in place. In other words, the surrounding circumstances demonstrate that the 2002 RFP, and HAN's awarding of the project to JRA, did not legally bind HAN to the extent that it would be liable to JRA if an agreement on terms could not be reached. Instead, the awarding of the project pursuant to the RFP constituted nothing more than an offer to negotiate by HAN for its procurement of a developer.

[9] The pre-RFP due process claim was is time-barred, as discussed *supra*.

### 3.    Equal Protection Claim

Plaintiff's remaining equal protection claim – the hostile workplace claim having been dismissed as time-barred – is based on a theory of constructive discharge.  Specifically, Plaintiff alleges that HAN discriminated against it as a woman-owned business when it allegedly sought out a "true developer"as a pretext to "jettison" JRA from the HOPE project through bad faith negotiations.  In support of its claim, Plaintiff points to the hiring of a new "non-woman owned" developer, Pennrose, who was allegedly given better contractual terms.  Although JRA is the party who left the bargaining table after only two negotiation sessions, despite being asked back by the Mayor, Plaintiff asserts that it was forced to leave – i.e., constructively discharged – because HAN indicated that the disputed  and allegedly unreasonable terms were nonnegotiable.  Defendants respond that JRA made the decision to leave the project, the material terms were not more advantageous to the new developer, and the negotiations were not a pretext for discrimination.

The Equal Protection Clause generally requires that "all persons similarly situated should be treated alike."  *Cutshall v. Sundquist*, 193 F.3d 466, 482 (6th Cir. 1999) (quoting *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985)).  The guarantee of equal protection is not itself a source of substantive rights, but rather it is "a right to be free from invidious discrimination in statutory classifications and other governmental activity." *Harris v. McRae*, 448 U.S. 297, 322 (1980).  To prevail on a § 1983 action for a violation of equal protection, Plaintiff must show intentional discrimination because of membership in a particular class or group singled out for discriminatory treatment, not merely that it was treated unfairly from an individual perspective.  *See Joyce v. Mavromatis*, 783 F.2d 56, 57 (6th Cir. 1986).

Unless the alleged discrimination is targeted at a suspect or protected class, however, the basic rule in equal protection analysis "is that state action is presumed to be valid and will be sustained if the classification drawn by the state is rationally related to a legitimate state interest." *Valot v. Southeast Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1229 (6th Cir. 1997). Here, although Plaintiff asserts that it was discriminated against as a woman-owned business, Plaintiff does not enter into the traditional intermediate scrutiny analysis for gender-based discrimination where the alleged discrimination would be sustained only if it was substantially related to an important governmental interest. Instead, Plaintiff cognizes an equal protection claim based on the "class of one" theory, which shifts the standard from intermediate scrutiny to rational basis review.[10] *See Village of Willowbrook v. Olech*, 528 U.S. 562, 563-65 (2000) ("Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.")

Ostensibly, there are two reasons why Plaintiff may have decided to take the "non-traditional" approach in pleading its equal protection claim,[11] although the "class of one"

---

[10] Whether a mistake or an intentional omission, Defendants completely ignore Plaintiff's reference to the "class of one" theory, and also fail to analyze why the circumstances of this case should proceed under which particular theory and, most importantly, whether Plaintiff's claim should succeed if analyzed under the "class of one" framework.

[11] Plaintiff's analytical path for reaching the "class of one" theory does not provide the Court with much valuable insight as to how Plaintiff arrived at its theory, at least not directly. After acknowledging that the crux of an equal protection claim is intentional discrimination based on membership in a particular class, Plaintiff states: "In the instant case, Plaintiff is a woman-owned developer business and was singled out and discriminated against based on its membership in that class. Plaintiff can proceed under a 'class of one theory,' because it can demonstrate that it was intentionally treated differently from others similarly situated and that there is no rational basis for the discrimination." (Doc. # 91, p. 33) (citations omitted).

doctrine is more of a catch-all for non-protected classes rather than an alternative theory.[12] First, the case law appears silent as to the classification of a woman-owned business, at least short of directly establishing such business as members of a protected class, i.e., gender discrimination. Even so, the plethora of case law involving minority "set-aside" programs for government contracting, which treat majority-owned businesses as a protected gender-based class for purposes of reverse discrimination analysis, implicitly suggest that a woman-owned business would likely fall into the suspect gender class. *See, e.g., Michigan Rd. Builders Assoc. v. Milliken*, 834 F.2d 583 (6th Cir. 1987). It also seems logical that a *cognizable* claim for discrimination against a woman-owned business, where that discrimination is proven to have occurred based on the status of the business as "woman-owned," would constitute a form gender discrimination mandating heightened scrutiny.

Second, and most likely from the Court's perspective, the record is simply devoid of any proof that HAN's alleged "constructive discharge" of JRA was predominantly motivated by a form of discrimination against JRA *as a woman-owned business*. The only evidence put forth is the indisputable fact that the next developer hired was a non-woman owned business and that the new developer allegedly received better terms. But a trier of fact could not find that HAN "intentionally discriminated on the basis of gender from the simple fact of a change from a female-controlled company to [a] male-controlled compan[y]." *Teri Lynn Enters. v. Pickell*, 203 Fed. Appx. 687, 691 (6th Cir. 2006) (unpublished). If any ulterior motive existed beyond classic hard-nosed negotiation, the

---

[12] A cursory overview of precedent addressing the "class of one" theory reveals almost exclusive application to cases where the plaintiff is not a member of a protected class.

record demonstrates that HAN may have desired to find another developer merely because it felt JRA was not up to the task, i.e., not the "true developer" that HAN was seeking.[13] This, of course, would be woefully insufficient to construct a viable claim for intermediate scrutiny pursuant to equal protection analytics because competent and probative evidence of *class-based* discrimination is necessary. *See Joyce v. Mavromatis*, 783 F.2d 56, 57 (6th Cir. 1986) ("equal protection argument fails here because the wrong is not alleged to be directed toward an individual as a member of a class or group singled out for discriminatory treatment"); *Bourcier v. Manistee*, 958 F.2d 371 (table), 1992 U.S. App. LEXIS 4936 (6th Cir. 1992) (unpublished) ("plaintiffs are unable to prove any class-based discrimination").

Irrespective of Plaintiff's reasons behind its choice of legal strategies, because Plaintiff proceeds under a "class of one" theory, the Court follows course. For claims brought by a "class of one," the plaintiff must allege "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564. Plaintiff asserts that it was intentionally treated differently from the developer that ultimately signed the Developer Services Agreement, Pennrose, and that there was no rational basis for HAN's conduct. Specifically, Plaintiff points to the contract between HAN and Pennrose, a non-woman owned business, alleging that the terms were "significantly better than what HAN offered to JRA. However, Plaintiff's

---

[13] The record is somewhat cryptic as to the true meaning behind the parties repeated references to HAN's search for a "true developer." However, as cited in Plaintiff's briefing, HAN indicated after the fact that they were looking for a company "to serve as a true developer putting forth all of the development guarantees and being at risk throughout the development process." (J.A. Vol. I, Exh. 105).

claim fails because, viewing the facts in a light most favorable to Plaintiff, a reasonable jury could not find that HAN lacked any rational basis for allegedly treating JRA disparately.

"Under rational basis scrutiny, government action amounts to a constitutional violation only if it 'is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational." *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006) (quoting *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005)) (finding, in a "class of one" context, that plaintiff failed to prove that defendant's actions lacked any rational basis). To demonstrate the lack of a rational basis, Plaintiff can either negate "every conceivable basis which might support" HAN's actions, or demonstrate that HAN's actions were "motivated by animus or ill-will." *Id.* Defendants have "no obligation to produce evidence to sustain the rationality of its actions" – i.e., the burden falls squarely on Plaintiff – and Defendants' choice to treat the new developer differently "is presumptively valid and 'may be based on rational speculation unsupported by evidence or empirical data.'" *Id.* (quoting *Trihealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 790 (6th Cir. 2005)).

Plaintiff does not explicitly argue that the actions of HAN were motivated by ill-will toward JRA, but instead asserts that HAN's alleged "business reasons" for the negotiation tactics were pretext to oust JRA from the project and replace it with a "true developer." Despite compelling evidence that both JRA and Pennrose received differing terms that favored each developer independently (i.e., Pennrose received some better terms but also some worse terms), Plaintiff now argues that the fee structure is the primary differentiation

that proves the lack of a rational basis.[14]  Plaintiff points to the alleged 15% fee received

by Pennrose and the 9% that HAN offered to JRA.  However, Plaintiff is the party that

initially proposed the 9% fee structure in its bid proposal pursuant to the RFP.[15]

Defendants surely possessed a rational basis for holding Plaintiff to its fee proposal during

negotiations, presumably because JRA was selected in lieu of other developers because

of the lower fee.  HAN was forced to accept the next bid in line from Pennrose, with the

attendant higher fee structure, after JRA made the decision to end negotiations.

Even assuming arguendo that Pennrose was treated more favorably relative to JRA,

Plaintiff's claim fails on its face because the desire to seek out a "true developer," which

even Plaintiff has vaguely defined as a developer willing to take on more financial risk, is

a rational basis for treating JRA disparately.  If HAN believed that Pennrose was taking on

---

[14] In her deposition, even Jan Rubin, owner of JRA, was unable to actually articulate what made Pennrose's deal better relative to the terms offered to JRA, stating: "I really find it difficult to do this, discussing what Pennrose got and what I didn't get or got and they didn't.  It's hardly a holisitic discussion of what they got versus what I didn't get."  (J.A. Vol. II, Rubin III, p. 110). Furthermore, when specifically asked what terms were significantly better in the Pennrose contract, Rubin answered: "Not necessarily in the agreement.  There are other circumstances that made things better."  (*Id.*).

[15] Among the numerous interrogatories that JRA sent to HAN before submitting its bid to the RFP, JRA inquired as to the fee structure that HAN was seeking:

    **38.**    **The budget shows a net 8% fee.  This is substantially below the Safe Harbor standards for such a project.  How would a more reasonable level of fee be paid given the current budget?**
    A fee will need to be negotiated between HAN and the selected developer.  Given that Safe Harbor guidelines currently show a developer fee acceptable of 9%, HAN does not believe that 8% is unreasonably low.  Safe Harbor guidelines provide up to a 12% fee, but only in extenuating circumstances.

(J.A. Vol. I, Exh. 25, p. 8) (bold in original).  After receiving HAN's responses, which arguably gave JRA a competitive advantage in receiving the project (which it ultimately received), JRA made the decision to submit a bid for the HOPE project with a proposed 9% fee structure and maintained its fee proposal throughout the negotiations.

more financial risk, HAN would be perfectly justified in giving Pennrose better compensation terms.  Moreover, Plaintiff is the party that left the bargaining table after only two negotiation sessions, despite months of contentious negotiations between the parties to reach their prior consulting agreement.  On the one hand, Plaintiff contends that it was forced to leave because HAN was offering unreasonable terms and insisting that they were non-negotiable.  On the other hand, however, Plaintiff concedes in its briefing that HAN officials later admitted that they were in fact prepared to make compromises.  This evinces a mere unwillingness by JRA to continue negotiations for business reasons, perhaps justifiably so, but this does not demonstrate an equal protection violation.

In the end, Plaintiff's equal protection claim appears to be nothing more than a "spurious challenge [to HAN's] consumer's choice" where a "governmental agency generally enjoys broad freedom to enter into contracts with private parties for the purchase of services." *TriHealth*, 430 F.3d at 788.  It is not for the Court to go through the material terms of each contract and attempt the inevitably futile exercise of assessing what terms favored what developer and why.  Under rational basis scrutiny, the burden is on Plaintiff to negative every conceivable non-discriminatory reason that HAN *could* have had for its decision to allegedly treat the replacement developer more favorably.  Plaintiff has failed to meet its burden.  Accordingly,  because a reasonable fact-finder could not conclude that HAN lacked any rational basis for its actions, Count III of Plaintiff's Complaint is dismissed.

## C.    State Law Claims

Although subject matter jurisdiction was originally vested with this Court pursuant to 28 U.S.C. § 1331 for a matter arising under federal statute, 42 U.S.C. § 1983, the

dismissal of all federal claims does not divest the Court of jurisdiction because, following the previous dismissal of Defendant Syme (Doc. # 24), complete diversity now exists among the parties and the amount in controversy exceeds $75,000. Consequently, original jurisdiction over Plaintiff's state law claims is vested pursuant to 28 U.S.C. § 1332.

### 1.     Promissory Estoppel

Count II of Plaintiff's Complaint alleges that JRA was initially selected by HAN in 1998 as more than a consultant. Plaintiff maintains that HAN chose JRA to be the long-term developer, despite the vague label of "development consultant," and continually represented to JRA that it would be the developer for the HOPE project. To that effect, Plaintiff brings a claim for promissory estoppel, asserting that HAN made a promise to JRA – namely, that it would be the developer – and that JRA reasonably relied on that promise to its detriment. JRA sets forth damages pertaining to lost opportunities on other projects as well as operating costs pertaining to preparation for long-term development work on the HOPE project, including hiring additional staff, relocating staff, and leasing office space.

The doctrine of promissory estoppel is "fundamentally different from a contract." *Davis v. Siemens Med. Solutions USA, Inc.*, 399 F. Supp. 2d 785, 797 (W.D. Ky. 2005). Promissory estoppel is not an alternative to a standard breach of contract claim, but rather it is founded upon a completely independent theory of recovery. *See id.* at 795. The purpose of the promissory estoppel doctrine, as it exists in the large majority of jurisdictions, including Kentucky, is to make enforceable "gratuitous promises" that would ordinarily be unenforceable as "unsupported by consideration." *See id.* at 797; *see also McCarthy v. Louisville Cartage Co., Inc.*, 796 S.W.2d 10, 12 (Ky. App. 1990) ("The whole

theory of a promissory estoppel action is that detrimental reliance becomes a substitute for consideration under the facts of a given case.").

Generally, a claim for promissory estoppel can arise where "a party reasonably relies on a statement of another and materially changes his position in reliance on that statement." *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 642 (Ky. Ct. App. 2003). To that effect, the required elements to state a claim for promissory estoppel are: "(1) a promise; (2) the promisee reasonably relies upon the promise by acting or forbearing to act upon the strength of it; (3) the promisor, at the time of making his promise, foresees or expects that the promisee would act or forbear in reliance upon it; and (4) enforcement of the promise is necessary to avoid an injustice." *Davis*, 399 F. Supp. 2d at 795 (citing to numerous Kentucky authorities). As to Plaintiff's proof in the case *sub judice*, despite substantial evidence in the record – specifically the consulting contracts[16] – evincing a mutual understanding between the parties that JRA would *likely* serve as developer for the HOPE project, Plaintiff's claim for promissory estoppel nevertheless fails, the reasons for which are three-fold.

First, because promissory estoppel is not intended to provide an alternative to a breach of contract claim, where a contract exists on the subject matter of the alleged promise sought to be enforced, a claim for promissory estoppel is not cognizable. *See Shane v. Bunzl Distrib. USA, Inc.*, 200 Fed. Appx. 397, 404 (6th Cir. 2006) (unpublished)

---

[16] Although the analysis herein will focus on the 1998 Consulting Agreement, which governed the parties relationship for the large majority of the relevant time period, an Amended Consulting Agreement was reached several months prior to the issuance of the RFP following the awarding of the HUD grant. However, the subsequent agreement being substantially similar in all terms material to the analysis, references will only be made to the original 1998 agreement.

(affirming the "widely accepted principle that promissory estoppel is applicable only in the absence of an otherwise enforceable contract" on the subject matter); *Davis*, 399 F. Supp. 2d at 799 ("an oral promise made prior to the execution of a written agreement that is inconsistent with the unambiguous terms of the written agreement cannot form the basis of a promissory estoppel claim."); *Tractor & Farm Supply v. Ford New Holland*, 898 F. Supp. 1198, 1205 (W.D. Ky. 1995) (promissory estoppel "cannot be the basis for a claim if it represents the same performance contemplated under a written contract."). In other words, "[p]romissory estoppel is not a doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove a breach of contract." *General Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1042 (6th Cir. 1990) (quoting *Walker v. KFC Corp.*, 728 F.2d 1215, 1220 (9th Cir. 1984)).

Here, a review of the consulting contracts between JRA and HAN demonstrates that the subject matter of the contracts covered both preliminary activities and development activities. In the 1998 agreement, an attached schedule of activities details all prospective tasks, from the very beginning phases of the HOPE project (pre-grant) to the very end post-development. The contract even identifies a dividing point for the various tasks, labeling them "Preliminary Development Activities" (Schedule 2, tasks A through C - 4) and "Permanent Development Activities" (Schedule 2, tasks C - 5 through D), and provides HAN with a right of termination prior to the beginning of the "Permanent Development Activities":

> 2. Term. The term of this Consulting Agreement shall commence on the date hereof and terminate at the end of the last date specified with respect to the Tasks outline in Schedule 2 with respect to each Task performed by Consultant. As outlined in Schedule 2, *it is understood by the parties that this is a multi-task project (i.e., tasks A, B, C and D) and that the Authority*

*has the absolute right subject to the provision of Paragraph 3 to terminate this Agreement before the tasks defined on Schedule 2 in Sections C-5 and C-6 and Section D are completed....*

\* \* \* \* \*

*The Authority further acknowledges that if Consultant is to undertake the satisfaction of the tasks specified in Sections C-5 and C-6 of Schedule 2, she would as a practical matter be unable to undertake substantial projects with clients other than the Authority and that at the time of completion of the tasks defined in Sections C-1 through C-4 of Schedule 2 (such sections having been referred to as the "Preliminary Development Activities"), the Authority will be able to determine whether it will have the financial capacity to proceed with the activities specified in Sections C-5, C-6 and D (jointly the "Permanent Development Activities").*

(J.A. Vol. I, Exh. 51, p.7, 9) (emphasis added).

The basis of Plaintiff's promissory estoppel claim is an alleged promise to perform work as the developer for the HOPE project.  But this performance is the partial subject matter of the contracts such that "estoppel cannot be the basis for a claim if it represents the same performance contemplated under a written contract."  *Tractor & Farm*, 898 F. Supp. at 1205.  Therefore, because negotiations between the parties resulted in contracts covering JRA's potential work as developer, no matter the terminology used (e.g, "development consultant"), Plaintiff is not permitted to assert promissory estoppel as a means to effectively alter the force of the valid agreements.

Second, assuming arguendo that Plaintiff's claim is cognizable, the termination provisions in the contract would render any reliance upon alleged promises made by HAN unreasonable.  The primary objective element of every promissory estoppel claim requires that the promisee's reliance on an alleged promise be reasonable.  *See Davis*, 399 F. Supp. 2d at 795.  In the present context, this question of reliance essentially asks whether JRA was justified, taking into account the entire scope of the parties' interactions and

-29-

communications, in acting upon HAN's alleged promise to make JRA the long-term developer for the HOPE project.  In this regard, Plaintiff's reliance, if any, could not have been reasonable because the record demonstrates that JRA was well aware of the possibility that it would not ultimately serve as the developer.

The contract clearly states, with a degree of specificity contrary to Plaintiff's boilerplate argument, that HAN possessed the right to terminate the contract upon the completion of the "Preliminary Development Activities" and prior to commencement of the "Permanent Development Activities."  The parties even negotiated liquidated damages ($250,000) in the event such a termination was to occur, taking into account the very "damages" Plaintiff now cites as evidence of its detrimental reliance.  The material details of HAN's right of termination are contained within Paragraph 3.5 of the 1998 agreement, which reads in its entirety:

> 3.5   The Authority acknowledges that Consultant has incurred obligations, foregone other employment opportunities, and billed the Authority on the premise that Consultant will be devoting several years to the completion of the work specified by the Agreement (for example, Consultant anticipates entering into leases and obligations to employees who will reside in the Newport area and has billed the Authority less for services in connection with the HOPE VI application than it would have charged had such services not been connected to the development and construction services included in this agreement).  The Authority further acknowledges that if Consultant is to undertake the satisfaction of the tasks specified in Sections C-5 and C-6 of Schedule 2, she would as a practical matter be unable to undertake substantial projects with clients other than the Authority and that at the time of completion of the tasks defined in Sections C-1 through C-4 of Schedule 2 (such sections having been referred to as the "Preliminary Development Activities"), the Authority will be able to determine whether it will have the financial capacity to proceed with the activities specified in Sections C-5, C-6 and D (jointly the "Permanent Development Activities").  *Consequently, after the Preliminary Development Plans required in Section C-4 of Schedule 2 have been submitted, if the Consultant is successful in obtaining the HOPE VI Grant for the Authority and the Authority terminates this Contract with respect to the matters specific in Section D of Schedule 2 or if the Authority,*

-30-

> *after review of the Preliminary Development Plan, elects to have Consultant*
> *proceed with the Permanent Development Activities and subsequently*
> *terminates this Agreement with respect to the Permanent Development*
> *Activities, the Authority will pay Consultant $250,000 as liquidated damages.*
> The preceding payment shall not apply if termination is for cause.

(J.A. Vol. I, Exh. 51, p. 9) (emphasis added).

While this language substantiates the belief underlying Plaintiff's entire action, that JRA was hired as more than a consultant, the language simultaneously cripples Plaintiff's promissory estoppel claim.[17]  JRA would not be reasonable in relying upon an alleged promise that it would be the developer where the contract speaks directly on the issue and permits termination of the contract prior to the commencement of the "Permanent Development Activities."  Simply put, JRA knew that there was a strong *likelihood* it would be retained as developer following the initial pre-development phases, but under the terms of the contract, there was no guarantee that HAN would keep JRA on board.  Therefore, any actions that JRA took to its detriment upon the mere assumption that it would be the developer were taken at a substantial risk to itself; such risks are not attributable to HAN because JRA's reliance was unreasonable as a matter of law.

---

[17] Plaintiff attempts to invalidate the termination clause on grounds that it is required by HUD, which is legally irrelevant when contained in the contract, and because Kentucky law reads a good faith requirement into any termination for convenience provisions (otherwise the consideration would be illusory).  *See Ram Eng'g & Constr., Inc. v. Univ. of Louisville*, 127 S.W.3d 579, 586-87 (Ky. 2003).  However, the good faith requirement does not alter the promissory estoppel analysis.  Simply because HAN could only have terminated the contract in good faith as a matter of law does not mean that during the time of JRA's alleged "reliance" it could have known that HAN was going to retain it as developer.  Not only could a "good faith" reasons have arisen to terminate JRA, but even assuming JRA's allegations are true that the RFP constitutes a "bad faith" attempt to jettison JRA, this still fails to change the outcome.  At the time JRA was allegedly relying on HAN's alleged promises, JRA had no way of knowing whether it would be terminated down the road, regardless of whether it would be for good faith or bad faith reasons.  Thus, JRA's reliance could not have been reasonable as a matter of law.

Finally, the consulting contracts between the parties also include the traditional boilerplate language regarding modification by prior agreements, oral or written, and that any future agreement as to the subject matter of the contract is only binding insofar as it is executed in writing.[18]  Such exclusionary clauses are intended to prevent alteration of contractual terms by extraneous agreements or parol evidence.  In that regard, a party "cannot reasonably rely on oral statements when it has acknowledged in writing several times that oral statements are not binding and may not be relied upon." *Rivermont Inn*, 113 S.W.3d at 642.  Therefore, given that this was an arms length deal between two sophisticated parties – as evidenced by lengthy negotiations with legal counsel involved – Plaintiff's claim that HAN promised JRA it would be the developer and that HAN should be liable to JRA for damages extending from that promise is unpersuasive.

In the end, while the record may support Plaintiff's continued assertion that JRA was hired by HAN to serve a role beyond a mere consultant, the record also makes clear that, as a matter of law, HAN's retainment of JRA was a possibility rather than an inevitability. The consulting agreements reached between the parties confirm that development services were contemplated by both parties from the beginning and this contemplation was memorialized.  However, this reality directly undercuts Plaintiff's claim because not only are

---

[18] The disclaimer reads in pertinent part:

8.  Entire Agreement; Modification; Waiver.  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and completely supersedes all prior oral agreements.  All other agreements with respect to the subject matter hereof between the parties hereto, whether written or oral, are merged herein.  No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by the parties hereto....

(J.A. Vol. I, Exh. 51, p. 10).

promissory estoppel claims generally incognizable where the subject matter of the alleged promise is covered by an enforceable contract, but the contractual terms of the contract herein make any reliance by JRA upon HAN's alleged promises unreasonable. Accordingly, Count II of the Complaint is dismissed.

### 2.    Good Faith and Fair Dealing

In Count I of its Complaint, Plaintiff asserts a cause of action for breach of contract based on JRA's initial belief that the awarding of the HOPE project pursuant to the RFP created a contract.  It now appears, as Defendants point out, that Plaintiff may have abandoned this claim and in its stead, despite the lack of an amendment to conform to the evidence, asserted a claim based on a duty of good faith and fair dealing.  It is difficult to assess the true parameters of the claim because Plaintiff's allegations in relation to its fair dealing claim, as contained in the briefing, are vague and the factual subject matter of the claim is difficult to decipher.[19]  Nevertheless, in attempting to reconcile both the Complaint and Plaintiff's briefing, the Court concludes that a fair reading of Plaintiff's intentions reveals a claim surrounding allegations that HAN breached its duty to negotiate in good faith based upon the award of the HOPE project pursuant to the RFP.  In other words, according to

---

[19] Plaintiff provides authority for several duties under the law, including a good faith requirement applied to the bid process, contracts, and contract negotiations, but the true basis for this claim is not clear where the only context in which Plaintiff places the fair dealing claim is an alleged bad faith use of the bid process, stating in its brief:

> Here, the evidence is unmistakable that HAN intended to use the RFP to jettison JRA, which it had long ago accepted as its developer, in favor of a preferred class – a "true developer," as HAN's counsel claimed.  Compounded with its misleading statement that HUD required HAN to engage in an RFP that it later admitted was solely its own decision, HAN's conduct here clearly violated its obligations of good faith and fair dealing to JRA.

(Doc. # 91, p. 25).

Plaintiff, HAN had a duty to negotiate the Development Services Agreement in good faith because of the RFP award and HAN subsequently breached this duty in an attempt to remove JRA from the project.

As discussed within the due process context, the award of the project to JRA pursuant to the RFP, which was essentially an offer to negotiate, did not create a protected property interest, let alone an enforceable contract for development services.[20] Notwithstanding the lack of a valid development contract resulting from the RFP, some jurisdictions do recognize contracts for future negotiations (a.k.a., "agreements to agree"), which either explicitly or implicitly place a good faith requirement upon the parties as to the future negotiations.  Plaintiff's fair dealing claim in the current case effectively traces this line of thinking, contending that the RFP award was a binding contract to the extent HAN was required to conduct future negotiations and to do so in good faith.

However, Plaintiff's claim fails because Kentucky law follows the "traditional 'all or nothing' approach" whereby the agreement is "enforceable as a binding contract to consummate the transaction or it is unenforceable as something less." *Cinelli v. Ward*, 997 S.W.2d 474, 478 (Ky. Ct. App. 1999) (construing the relevant agreement as merely an attempt to bind the parties to good faith negotiations while finding such agreement unenforceable under Kentucky law).  To that effect, even if the parties intended to be bound to future good faith negotiations on the basis of a preliminary agreement (i.e., the RFP),

---

[20] It is undisputed that the RFP award did not create a valid contract for development services, as evidenced not only by the lack of any agreed upon terms between the RFP and JRA's proposal, but also by Plaintiff's failure to plead as such.  *See Cinelli v. Ward*, 997 S.W.2d 474, 477 (Ky. Ct. App. 1999) ("Where an agreement leaves the resolution of material terms to future negotiations, the agreement is generally unenforceable for indefiniteness unless a standard is supplied from which the court can supplant the open terms should negotiations fail.").

which constitutes a tenuous interpretation of the record, it is still only "an agreement to negotiate in good faith and, as such, without legal import." *Id.* In other words, in Kentucky, "agreements to bind parties to future negotiations in good faith are unenforceable agreements to agree," especially as executed between sophisticated business entities. *Giverny Gardens v. Columbia Hous. Partners*, 147 Fed. Appx. 443, 449-50 (6th Cir. 2005) (unpublished) (applying *Cinelli* as the controlling law in Kentucky).

Simply put, "[u]nder Kentucky law, it is well-established that the implied covenant of good faith and fair dealing arises from an enforceable contract." *Id.* at 450. Accordingly, because the RFP award at most constituted an agreement to future negotiations, it was not an enforceable contract under Kentucky law and, therefore, a duty of good faith and fair dealing did not arise. Plaintiff's claim fails as a matter of law and Count I of the Complaint is dismissed.

## IV.  CONCLUSION

In accordance with the foregoing analysis, and in the absence of any genuine issues of material fact, summary judgment is appropriate as to all four counts of Plaintiff's Complaint and Defendants prevail as a matter of law.[21]

For the reasons set forth above, **IT IS ORDERED** that:

(1)    Defendant HAN's Motion for Summary Judgment (Doc. # 83) be, and hereby is, **GRANTED**;

(2)    Defendant Brown's Motion for Summary Judgment (Doc. # 84) be, and

---

[21] The Court recognizes that Plaintiff has moved for summary judgment on Defendant HAN's counterclaims. Pursuant to a separate Order entered concurrently herewith, that motion has been denied without prejudice pending notification by Defendant HAN of its intentions to pursue those counterclaims. If so, Plaintiff's motion will be resubmitted upon the filing of Defendant's notice.

hereby is, **GRANTED**;

(3)    Accordingly, all counts in Plaintiff's Complaint be, and hereby are,

    **DISMISSED WITH PREJUDICE**;

(4)    All Counts having been dismissed, Plaintiff's Complaint is hereby **STRICKEN**

    from the active docket of this Court; and

(5)    A Judgment in favor of Defendants, on Plaintiff's claims only, will be entered

    concurrently herewith.

This 30th day of March, 2007.



Signed By:

*David L. Bunning*

United States District Judge

G:\DATA\Opinions\2-03-160 Jan Rubin (MSJ MOO).wpd